NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

WELLS FARGO BANK NA, *Plaintiff/Appellee,*

*v.*

TERRENATE ENTERPRISES INC, et al., *Defendants/Appellants.*

No. 1 CA-CV 19-0081

FILED 5-26-2020

Appeal from the Superior Court in Maricopa County
No. CV 2015-006912
The Honorable Roger E. Brodman, Judge

**AFFIRMED**

COUNSEL

Gallagher & Kennedy PA, Phoenix
By Dale C. Schian, Kortney Otten
*Counsel for Defendants/Appellants*

Engelman Berger PC, Phoenix
By Wade M. Burgeson, Bradley D. Pack
*Counsel for Plaintiff/Appellee*

## MEMORANDUM DECISION

Judge Jennifer B. Campbell delivered the decision of the Court, in which Presiding Judge Paul J. McMurdie and Judge Kent E. Cattani joined.

**C A M P B E L L**, Judge:

¶1         Terrenate Enterprises, Inc. ("TEI"), Cornejo Enterprises, Inc. ("CEI"), Santos and Eva Cornejo ("the Cornejos"), Fernando Cornejo, and Teresa Cornejo (collectively, "the Defendants") appeal from the superior court's judgment in favor of Wells Fargo Bank, N.A. ("Wells Fargo"). For the following reasons, we affirm.

## BACKGROUND

¶2         The Cornejos and their children, Fernando and Teresa Cornejo, own and operate a restaurant. They are also the principals of both TEI and CEI.

¶3         In July 2007, TEI obtained two loans from Wells Fargo. The first loan ("First TEI Loan") of $1,563,300 was secured by a deed of trust conveying to Wells Fargo a first position lien on certain real property ("the Pinal Property"). As additional security, CEI and the Cornejos executed separate corporate and personal guarantees assuring repayment of the First TEI Loan. The second loan ("Second TEI Loan") of $1,157,000 was secured by a second deed of trust conveying to Wells Fargo a second position lien on the Pinal Property. In their separate guarantees, the Cornejos also assured repayment of the Second TEI Loan.

¶4         In December 2007, CEI obtained a loan of $648,400 ("CEI Loan") from Wells Fargo, secured by an agreement granting Wells Fargo a lien on and interest in all CEI inventory, equipment, and accounts. To provide additional security, the Cornejos executed two deeds of trust conveying to Wells Fargo liens on certain real properties ("the San Lazaro Property" and "the Indian Trail Property"). TEI and the Cornejos also executed separate personal guarantees assuring repayment of the CEI Loan.

¶5         In October 2009, TEI, CEI, and the Cornejos negotiated modification agreements with Wells Fargo to extend the repayment terms of the TEI and CEI Loans. In conjunction with the TEI modification agreement, the Cornejos executed first and second deeds of trust conveying

to Wells Fargo first and second position liens on certain real properties ("the Sunland Gin Property" and "the Eloy Property"). No additional deeds of trust were executed in conjunction with the CEI modification agreement.

¶6            During the three years that followed, the Defendants entered several other modification and addendum agreements with Wells Fargo that both extended the terms for repayment and required additional guarantees. Despite these extensions, the Defendants failed to make the requisite payments when due. After Wells Fargo provided the Defendants with written notice of default on the TEI and CEI Loans, it accelerated the unpaid balances on each.

¶7            On May 20, 2015, Wells Fargo foreclosed its liens on the Pinal and Sunland Gin Properties by conducting trustee's sales. It purchased the Pinal Property with a $1,487,260 credit bid and the Sunland Gin Property with a $351,285.32 credit bid.

¶8            Six days later, Wells Fargo filed a complaint against the Defendants alleging: (1) breach of contract (against TEI and CEI (loan documents)), (2) breach of contract (against the Defendants (guarantees)), (3) breach of the implied covenant of good faith and fair dealing (against the Defendants), (4) declaratory relief for possession of real properties and other collateral (against the Defendants), (5) deficiency on the Pinal Property (against the Defendants), and (6) deficiency on the Sunland Gin Property (against the Defendants).[1] Wells Fargo asserted the Defendants owed: (1) $366,891.85 on the First TEI Loan, (2) $792,905.45 on the Second TEI Loan, and (3) $523,579.04 on the CEI Loan.

¶9            In their answer, the Defendants admitted that TEI, CEI, and the Cornejos had failed to pay the amounts due and owing on the three loans. But they raised numerous affirmative defenses, such as alleging Wells Fargo's claims were barred because the fair market value of the Pinal and Sunland Gin Properties exceeded the total unpaid balances on the TEI and CEI Loans.

---

[1]      Wells Fargo later amended its complaint to allege claims for quiet title and reformation concerning the Eloy Property, a parking lot parcel adjacent to the Sunland Gin Property. The parties eventually settled the quiet title claim, however, and the Eloy Property was transferred to Wells Fargo. As part of that settlement agreement, the Defendants received a $165,000 credit against their outstanding debts.

¶10 More than a year into the litigation, the Defendants asked the superior court to determine the fair market value of the Pinal and Sunland Gin Properties at the time of the trustee's sales. In their request, the Defendants reasserted their contention that the fair market value of the Pinal and Sunland Gin Properties exceeded Wells Fargo's credit bids, and, therefore, no deficiency remained "due and owing under the loans."

¶11 At an evidentiary hearing on the motion, the parties presented conflicting expert opinion testimony concerning the Pinal and Sunland Gin Properties' fair market values on the date of the trustee's sales. After considering the evidence, the superior court determined that the fair market value of the Pinal Property was $2,351,960, and the fair market value of the Sunland Gin Property was $523,780.16.

¶12 At that point, Wells Fargo moved for partial summary judgment on its claims that: (1) TEI and CEI breached their obligations under the loan documents, (2) the Defendants breached their obligations under the guarantees, and (3) deficiency balances remained due and owing under both the First and Second TEI Loans. In response, the Defendants argued that genuine issues of material fact concerning the alleged remaining deficiencies precluded summary judgment. While conceding Wells Fargo had proved the principal balances of the TEI Loans, the Defendants contended Wells Fargo had failed to prove the amount of interest and late charges purportedly owed. Nonetheless, the Defendants asserted that, even accepting Wells Fargo's calculations, there was a "sizeable surplus" on the TEI Loans, exclusive of attorneys' fees and costs, that had to "be applied to the outstanding balance" on the CEI Loan.

¶13 After the parties fully briefed the matter, the superior court granted Wells Fargo's motion for partial summary judgment in part, concluding no genuine dispute of material fact existed concerning: (1) the Defendants' breach of the loan documents and associated guarantees, and (2) the principal balances due. The court found issues of fact remained, however, as to whether: (1) the Pinal and Sunland Gin Properties secured both the TEI and CEI Loans, (2) there was a surplus on the TEI Loans, and (3) any TEI Loan surplus should be applied to the CEI Loan.

¶14 After trial, the superior court found: (1) neither the Pinal nor Sunland Gin Properties secured the CEI Loan; (2) Wells Fargo proved the interest and late charges that accrued on the TEI and CEI Loans; (3) Wells Fargo was entitled to an award for the reasonable attorneys' fees and costs it incurred enforcing the Defendants' obligations under the loan documents; (4) the total amount owed for the First and Second TEI Loans

as of the date of the trustee's sales was $1,746,633.02 (First TEI Loan) plus $1,126,067.13 (Second TEI Loan) plus $68,121.20 (costs and expenses associated with enforcement, exclusive of attorneys' fees); (5) the Defendants were entitled to offsets for the fair market values of the Pinal and Sunland Gin Properties and the $165,000 settlement agreement; (6) the Defendants owed Wells Fargo $2,940,821.35 on the TEI Loans, plus undetermined attorneys' fees, with offsets of $3,040,740.16; (7) Wells Fargo received $99,919 more than it was owed on the TEI Loans, exclusive of attorneys' fees; and (8) the Defendants owed Wells Fargo $573,803.60 on the CEI Loan.

¶15 Both parties filed applications for an award of attorneys' fees. The superior court denied the Defendants' request and awarded Wells Fargo $15,761.50 for attorneys' fees incurred before the trustee's sales and $170,000 for attorneys' fees incurred during the litigation. After subtracting the prelitigation attorneys' fees from the $99,919 surplus on the TEI Loans, the court applied the remaining $84,157.50 overage to the outstanding balance on the CEI Loan, finding Wells Fargo was entitled to $481,671 on the CEI Loan and $170,000 for its litigation attorneys' fees.

¶16 Once the superior court reduced its findings and conclusions to a final judgment, the Defendants timely appealed.

## DISCUSSION

### I. Fair Market Values

¶17 The Defendants challenge the superior court's fair market valuations of the Pinal and Sunland Gin Properties. First, they contend Wells Fargo failed to prove the Pinal and Sunland Gin Properties' fair market values *on the date of the trustee's sales*, as required by statute. Second, they assert Wells Fargo's appraisals imposed improper conditions, artificially lowering the Pinal and Sunland Gin Properties' valuations.

¶18 "The valuation of assets is a factual determination that must be based on the facts and circumstances of each case." *Kelsey v. Kelsey*, 186 Ariz. 49, 51 (App. 1996). Because the superior court is in the best position to assess and resolve conflicting evidence, we accept its factual findings absent clear error. *Id.*; *A.N.S. Props., Inc. v. Gough Indus., Inc.*, 102 Ariz. 180, 182 (1967) (explaining "we will not substitute our opinion" for that of the superior court "if there is any reasonable evidence" to support the superior court's findings). In determining a property's fair market value, the court has the discretion to rely on a testifying expert's opinion, and if the expert "fails to calculate the value of an asset according to standard methodology,

that failure goes to the weight of the expert's opinion," not its admissibility. *See Kelsey*, 186 Ariz. at 51. Likewise, the court "may adopt portions of the evidence from different witnesses," and we "will sustain a result anywhere between the highest and lowest estimate which may be arrived at by using the various factors appearing in the testimony in any combination which is reasonable." *CSA 13-101 Loop, LLC v. Loop 101, LLC*, 233 Ariz. 355, 362-63, ¶ 25 (App. 2013) (internal quotations omitted).

¶19 At the valuation hearing, Wells Fargo submitted the appraisals for both the Pinal and Sunland Gin Properties as exhibits. Using multiple approaches (sales comparison, income, as-is value), the appraisal reports reflected that: (1) the Pinal Property's value range on March 25, 2015 was between $2,335,000 and $2,545,000, and (2) the Sunland Gin Property's value range on March 25, 2015 was between $165,000 and $290,000. When asked to explain the substantial discrepancy between the appraisal figures and Wells Fargo's credit bids on the Properties, Wells Fargo's Vice-President of Loan Adjustment, Dorothy Koster, acknowledged that Wells Fargo had made "modifications from the actual appraisals." She maintained, however, that the credit bids, at their core, "stemmed from the appraisal[s]." For example, Koster stated that in calculating the credit bids, Wells Fargo deducted carrying costs from the appraisal values. Despite the reduced credit bids, Koster "agreed" the Defendants should receive credit for the Properties' full appraisal values minus outstanding property taxes.

¶20 Wells Fargo's appraiser for both Properties, Albert Nava, testified regarding his methodology. Specific to the Pinal Property, Nava explained that: (1) it is "over-improve[d]" for its market; (2) it is a mixed-use property (restaurant, banquet facility, and office rental space), which presents a "marketing challenge" given its location; and (3) the office-space tenant's lease expired in April 2015, resulting in a loss of rental income. Nava also noted the Defendants' financial statements from 2012 to 2014 demonstrated a loss of revenue from the Pinal Property and explained Wells Fargo asked him to conduct a market value assessment with an assumption that the property was vacant. For the Sunland Gin Property appraisal, Nava likewise testified that Wells Fargo provided him with valuation parameters as well as comparable sales. Nonetheless, he avowed that he independently determined the Properties' valuations. When asked about the valuation date for the Properties, March 25, 2015—55 days before the trustee's sales on May 20, 2015—Nava testified that the market was stable and there was no fluctuation in value during the interim period.

¶21 Testifying for the defense, William Dominick acknowledged that he conducted his appraisals of the Pinal and Sunland Gin Properties

on April 8, 2016, but stated his valuations applied retroactively to May 20, 2015. He explained there were no comparable sales in the Properties' area, so he used other markets' restaurants and adjusted for differences in location. In contrast to Nava's figures, Dominick concluded the fair market value of the Pinal Property on May 20, 2015 was $2,940,000 and the fair market value of the Sunland Gin Property on May 20, 2015 was $550,000. When asked about his methodology for determining the Properties' retroactive valuations, Dominick explained "relatively stable market conditions" existed from the eight months that preceded the trustee's sales until a year afterward, allowing him to reasonably apply the Properties' values on April 8, 2016 retroactively to May 20, 2015.

**¶22** After hearing from the witnesses and reviewing the affidavits and exhibits, the superior court determined the Properties required different appraisal methodologies. Because the Pinal Property was operating at a loss, the court determined Nava's use of vacant buildings as comparable sales was more appropriate than Dominick's use of chain restaurants. Specifically, the court found, "[f]or practical purposes," the Pinal Property "could be treated" as vacant because there was no basis to conclude it could continue to operate into the foreseeable future. Accordingly, the court adopted Nava's overall approach for appraising the Pinal Property. The court disagreed, however, with Nava's deduction of $166,000 for lease-up costs, explaining the Pinal Property had already been devalued based on vacancy, reflecting the loss of rental income. In adopting Nava's approach, the court expressly rejected the Defendants' contention that Nava's appraisal was statutorily defective because it reflected a fair market value as of March 25, 2015, rather than May 20, 2015. In so doing, the court found the undisputed evidence demonstrated there was no material change either to the Pinal Property or the broader market during that interim period. Deviating only slightly from Nava's appraisal, the court concluded the fair market value of the Pinal Property as of the date of the trustee's sale was $2,500,000.

**¶23** In contrast, the superior court found "that a 'going concern' evaluation" was appropriate for the Sunland Gin Property, noting it had successfully operated for many years and garnered sufficient net revenues "to cover rent." As such, the court found "Dominick's analysis more credible because he did not assume the Sunland Property was vacant." Relying primarily on Dominick's opinion testimony, the court determined the fair market value of the Sunland Gin Property as of the date of the trustee's sale was $540,000.

**¶24**         After deducting the outstanding property taxes for each property in accordance with A.R.S. § 33-814, the superior court determined the statutory fair market value of the Pinal Property as of the date of the trustee's sale was $2,351,960 and the statutory fair market value of the Sunland Gin Property as of the date of the trustee's sale was $523,780.16.

**¶25**         To recover a balance owed after a trustee's sale, a party must bring a deficiency action against any person "liable on the contract for which the trust deed was given as security, including any guarantor of or surety for the contract," within 90 days of the sale. A.R.S. § 33-814(A). In such an action,

> [T]he deficiency judgment shall be for an amount equal to the sum of the total amount owed the beneficiary as of the date of the sale, as determined by the court less the fair market value of the trust property on the date of the sale as determined by the court or the sale price at the trustee's sale, whichever is higher.
>
> . . . .
>
> "[F]air market value" means the most probable price, as of the date of the execution sale . . . after deduction of prior liens and encumbrances with interest to the date of the sale, for which the real property or interest therein would sell after reasonable exposure in the market under conditions requisite to fair sale, with the buyer and seller each acting prudently, knowledgeably and for self-interest, and assuming that neither is under duress.

*Id.*

**¶26**         We interpret statutes de novo. *Wilks v. Manobianco*, 237 Ariz. 443, 446, ¶ 8 (2015). "When interpreting a statute, our primary goal is to give effect to the legislature's intent." *Id.* (internal quotation omitted). "We derive that intent by examining the statute's language." *Id.* When construing a statute, each word or phrase "must be given meaning so that no part is rendered void, superfluous, contradictory or insignificant." *Pinal Vista Properties, L.L.C. v. Turnbull*, 208 Ariz. 188, 190, ¶ 10 (App. 2004) (internal quotation omitted).

**¶27**         The Defendants contend Wells Fargo failed to meet its burden of proof under A.R.S. § 33-814(A) by relying on appraisals conducted 55 days before the trustee's sales. Although the statute requires *the court* to

determine a property's fair market value *as of the date of the trustee's sale*, nothing in the statute requires the party seeking a deficiency judgment to conduct appraisals on the date of the actual sale.

**¶28** In this case, both parties' experts opined that the real estate market was stable during the months preceding the trustee's sales and no market fluctuations altered the fair market values of the Pinal and Sunland Gin Properties between March and May 2015. On this record, the superior court did not abuse its discretion by finding the evidence adequately established the fair market values of the Pinal and Sunland Gin Properties on the date of the trustee's sales.[2] *See Fannie Mae v. LaRuffa*, 702 Fed. Appx. 505, 507 (9th Cir. 2017) ("[A] valuation conducted months before the date of a trustee sale may be credited so long as evidence is presented that connects the date of valuation to the date of the sale.").

**¶29** Next, the Defendants argue the superior court erred by substantially adopting Nava's appraisal of the Pinal Property.[3] They contend Nava applied improper assumptions when he calculated the fair market value—classifying the property as both "owner-user" and vacant, as well as applying a "carrying" discount.

**¶30** Challenges to "the accuracy and reliability of a witness' factual basis, data, and methods go to the weight and credibility of the witness' testimony and are questions of fact." *Logerquist v. McVey*, 196 Ariz. 470, 488, ¶ 52 (2000). While the Defendants correctly note that A.R.S. § 33-814 defines fair market value as "the most probable price . . . for which the real property . . . would sell after reasonable exposure in the market under conditions requisite to fair sale," the statute tasks the court, as the fact-finder, with determining what constitutes fair conditions.

---

[2] Although the Defendants argue Wells Fargo had the burden of proving the Pinal and Sunland Gin Properties' values, A.R.S. § 33-814(A) does not impose that requirement on the party seeking a deficiency judgment. Instead, the statute permits the debtor to apply for a determination of the fair market value of the real property, *id.*, and, as the moving party, the debtor has "the burden of going forward with the evidence." *Life Inv'rs Ins. Co. of Am. v. Horizon Res. Bethany, Ltd.*, 182 Ariz. 529, 533 (App. 1995).

[3] While the Defendants do not expressly limit their challenge to the superior court's valuation of the Pinal Property, the record reflects that the court adopted their expert's valuation of the Sunland Gin Property.

**¶31** Here, the superior court concluded that Nava properly classified the Pinal Property as owner-occupied because the Defendants both owned the property and used it for their restaurant. Based on the Defendants' substantial loss of revenue from the property during the preceding years, the court found that Nava properly applied a vacancy assumption as well, determining there was no basis to conclude the property could function as a viable restaurant in the foreseeable future. The court rejected Nava's imposition of "carrying" costs, however, and increased Nava's fair market valuation accordingly. Because substantial evidence supports these findings, the superior court's valuation of the Pinal Property was not clearly erroneous.[4]

## II. Security for the CEI Loan

**¶32** The Defendants contend the superior court improperly permitted Wells Fargo to change its position concerning which properties secured the CEI Loan. Asserting they relied, to their detriment, on Wells Fargo's representations that the Pinal and Sunland Gin Properties secured the CEI Loan, the Defendants argue the court should have found Wells Fargo judicially estopped from claiming otherwise.

**¶33** In its statements of breach, Wells Fargo stated that the Pinal and Sunland Gin Properties secured both the TEI and CEI Loans. Likewise, in both its original and amended complaints, Wells Fargo indirectly alleged that the Pinal and Sunland Gin Properties secured the three loans, collectively.

**¶34** A week before the fair market valuation hearing, however, Wells Fargo submitted Koster's affidavit, which stated the appraisal values of the Pinal and Sunland Gin Properties should be credited against the balances of the TEI Loans, with no reference to the CEI Loan. Likewise, at trial, Wells Fargo's attorney asserted that the Pinal and Sunland Gin Properties secured only the TEI Loans. As support for this contention,

---

[4] To the extent the Defendants contend Wells Fargo used unethical valuation practices to artificially decrease its Pinal and Sunland Gin Property credit bids, thereby artificially increasing the remaining deficiencies on the TEI Loans following the trustee's sales, application of A.R.S. § 33-814's fair market value provision prevented Wells Fargo from obtaining an undeserved windfall. *CSA 13-101 Loop, LLC v. Loop 101, LLC*, 236 Ariz. 410, 413, ¶ 13 (2014) ("Section 33-814(A) protects against artificially inflated deficiencies by preventing windfalls resulting from below-market credit bids.").

counsel elicited testimony from Koster that the TEI modification agreement contained a cross-collateralization provision whereby the security for each TEI Loan secured the indebtedness of the other TEI Loan, but neither the original TEI Loans nor the TEI modification agreement contained a cross-collateralization provision for the CEI Loan. Addressing this point further, Koster testified that the CEI modification agreement contained a cross-collateralization provision securing the TEI Loans with the San Lazaro and Indian Trail Properties, but did not provide that the Pinal and Sunland Gin Properties secured the CEI Loan.

¶35        During closing argument, Wells Fargo's attorney asserted that the language of the TEI and CEI Loan documents, not the legal theories advanced in Wells Fargo's statements of breach or complaints, exclusively determined which properties secured the CEI Loan. Defense counsel countered that the Pinal and Sunland Gin Properties necessarily secured the CEI Loan because: (1) the Defendants both owned those properties and served as guarantors on the CEI Loan, and (2) Wells Fargo stated the Properties secured all three loans in its complaints. Building on that contention, defense counsel argued that the $165,000 settlement agreement offset should be credited against the balance owed on the CEI Loan. In rebuttal, Wells Fargo's attorney argued the $165,000 offset should be credited against the attorneys' fees and costs Wells Fargo incurred to enforce the TEI Loans.

¶36        After taking the matter under advisement, the superior court determined that under the express terms of the loan documents, neither the Pinal nor Sunland Gin Properties secured the CEI loan. Acknowledging that Wells Fargo's statements of breach contained language suggesting that both properties secured the CEI Loan, the court explained a statement of breach does not create a lien and may not be used to imply a grant of a security interest. While the TEI modification agreement contained a cross-collateralization provision between the First and Second TEI Loans, the court further found no comparable provision concerning the CEI indebtedness. In making this finding, the court expressly rejected the Defendants' claim that Wells Fargo was judicially estopped from arguing the CEI Loan was not secured by the Pinal and Sunland Gin Properties, finding "no persuasive evidence that Wells Fargo took a contrary position to the prejudice of the defendants." The court largely agreed with the Defendants' contention regarding the $165,000 settlement agreement offset, however, and deducted only Wells Fargo's costs and prelitigation attorneys' fees incurred in enforcing the TEI Loans from that amount, applying the remainder, $84,157.50, to the balance owed on the CEI Loan.

¶37      First, the Defendants argue that Wells Fargo's statements of breach created an ambiguity concerning which properties secured the CEI Loan. They contend this alleged ambiguity should have been resolved against Wells Fargo or, in the alternative, that they should have been permitted to explore the parties' intent "in front of a jury."

¶38      We review the interpretation of a contract de novo. *Grosvenor Holdings, L.C. v. Figueroa*, 222 Ariz. 588, 593, ¶ 9 (App. 2009). "[W]hen parties bind themselves by a lawful contract, the terms of which are clear and unambiguous, a court must give effect to the contract as written." *Id.* (internal quotation omitted). In other words, the purpose of contract interpretation is to determine and enforce the parties' intent, and when that intent "is expressed in clear and unambiguous language, there is no need or room for construction or interpretation and a court may not resort thereto." *Id.* (internal quotation omitted).

¶39      The TEI and CEI Loan documents are not ambiguous. To the contrary, they clearly reflect that apart from guarantees and a lien on CEI's inventory, equipment, and accounts, the CEI Loan was secured only by deeds of trust to the San Lazaro and Indian Trail Properties.

¶40      Nonetheless, construing the terms "related document" and "indebtedness" broadly, as those terms are used in the loan documents, the Defendants contend the CEI modification agreement is essentially encompassed within the TEI modification agreement, and therefore the TEI and CEI Loans are secured by the same properties. As defined in the TEI Loan documents: (1) related documents are "all promissory notes, credit agreements, loan agreements, environmental agreements, guarantees, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and other instruments, agreements and documents, whether now or hereafter existing, *executed in connection with the Loan*"; and (2) "indebtedness" is "all principal and interest together with all other indebtedness and costs and expenses for which Borrower is responsible *under this Agreement or under any of the Related Documents*." Under these definitions, related documents are limited to contracts entered "in connection with" the TEI Loans, not separate loan agreements. Nonetheless, even if the definitional provisions set forth in the TEI Loan documents could otherwise lend themselves to the Defendants' posited construction, the CEI modification agreement plainly and unambiguously states that the Defendants' "indebted[ness]"under the TEI Loan is "pursuant to separate debt instruments and obligations." Simply put, the CEI modification agreement makes clear that it is a discrete contract, wholly distinct from the TEI modification agreement.

**¶41** Moreover, while the Defendants contend Wells Fargo's representations, years after the loan documents were executed, somehow injected ambiguity into the otherwise unambiguous contracts, they have cited no authority for this proposition and our research has revealed none. To the contrary, the Defendants cite cases holding that both the circumstances surrounding contract formation and the parties' conduct before a controversy arises provide the best evidence of an ambiguous contractual term's meaning. *See Pendergast v. Ariz. State Ret. Sys.*, 234 Ariz. 535, 541, ¶ 19 (App. 2014); *United Cal. Bank v. Prudential Ins. Co. of Am.*, 140 Ariz. 238, 264-65 (App. 1983). These cases are inapposite because the TEI and CEI Loan documents are not ambiguous and Wells Fargo's statements of breach and complaints were clearly drafted after a controversy arose.

**¶42** Next, the Defendants contend Wells Fargo was judicially estopped from changing its position. We review a superior court's decision whether to apply judicial estoppel for an abuse of discretion. *See State v. Brown*, 212 Ariz. 225, 228, ¶ 13 (2006). "Judicial estoppel is not intended to protect individual litigants but is invoked to protect the integrity of the judicial process by preventing a litigant from using the courts to gain an unfair advantage." *Id.* (internal quotation omitted). "Three requirements must exist before the court can apply judicial estoppel: (1) the parties must be the same, (2) the question involved must be the same, and (3) the party asserting the inconsistent position must have been successful in the prior judicial proceeding." *State v. Towery*, 186 Ariz. 168, 182 (1996). Because no issue concerning the security for the CEI Loan was litigated in a prior judicial proceeding, the doctrine of judicial estoppel has no application to this case.

**¶43** Furthermore, although the Defendants contend they relied to their detriment on Wells Fargo's statements of breach when they entered the settlement agreement, they have demonstrated no resulting prejudice. The record clearly reflects the superior court applied the surplus from the settlement agreement offset to the amount owed on the CEI Loan. Therefore, the Defendants received the benefit they bargained for in the settlement agreement.

**¶44** Finally, the Defendants contend, had they known the Pinal and Sunland Gin Properties only secured the TEI Loans, they would not have requested a fair market valuation hearing or trial "because there was no deficiency" on the TEI Loans. Nothing in the record supports this assertion. The parties provided vastly different valuations for the Properties. Had the superior court accepted both of Wells Fargo's valuations, deficiencies would have remained on the principal balances of

the TEI Loans. Furthermore, on this record, there is no basis to conclude the Defendants would have accepted Wells Fargo's calculation of interest, late fees, and costs on the three loans had they known that the Pinal and Sunland Gin Properties did not secure the CEI Loan. Therefore, because the unambiguous language of the TEI and CEI Loan documents clearly and unequivocally establishes the security for the CEI Loan, the superior court did not err by finding Wells Fargo was not bound by its subsequent representations, made years after contract formation.

## III.    Request for a Jury Trial

**¶45**        The Defendants contend the superior court improperly denied their request for a jury trial. They argue Wells Fargo created a jury issue by changing its position concerning the security for the CEI Loan.

**¶46**        After the superior court entered its fair market value findings, the Defendants demanded a jury trial. In response, Wells Fargo argued the Defendants waived their right to a jury trial by failing to make a timely request under Arizona Rule of Civil Procedure ("Rule") 38(d). The Defendants countered that Rule 38(b) requires only that a request for a jury trial be filed no later than ten days after the date a joint report or proposed scheduling order is filed, not that a request be filed no later than ten days after the *original* joint report or scheduling order is filed. Because their demand for a jury trial was filed before the filing of the second amended joint report and the third amended scheduling order, though more than a year after the original joint report was filed, the Defendants asserted the request was timely. Nonetheless, the court summarily found the Defendants had waived their right to a jury trial.

**¶47**        "Whether a party is entitled to a jury trial is a question of law we review de novo." *Carey v. Soucy*, 245 Ariz. 547, 550-51, ¶ 12 (App. 2018). Likewise, we review the interpretation of statutes and rules de novo. *In re Commitment of Jaramillo*, 217 Ariz. 460, 462, ¶ 5 (App. 2008). We affirm the superior court's ruling if it is correct for any reason. *Forszt v. Rodriguez*, 212 Ariz. 263, 265, ¶ 9 (App. 2006).

**¶48**        Under A.R.S. § 33-814(A), "the court," not a jury, is tasked with determining both the fair market value of trust property and the amount owed to the beneficiary on the date of the trustee's sale. Upon making these findings, "the court" shall issue an order crediting the amount due on the judgment. *Id.* "Nowhere in the language of the statute is a jury suggested or required." *Life Inv'rs Ins. Co. of Am.*, 182 Ariz. at 531. Nor does

14

the constitution confer a "right to a jury trial" in a deficiency action. *Id.* at 532.

¶49        Although the Defendants concede that debtors are not generally entitled to a jury trial for the "matters at issue in this case," they assert Wells Fargo created a factual issue, triable to a jury, when it asserted, mid-litigation, that the Pinal and Sunland Gin Properties secured only the TEI Loans. As discussed, the plain language of the CEI Loan documents makes clear only two properties secured the CEI Loan, the San Lazaro and Indian Trail Properties. Because there was no contractual ambiguity regarding the CEI Loan's security, there was no factual issue for a jury to resolve.[5] *Cf. State v. Mabery Ranch, Co., L.L.C.*, 216 Ariz. 233, 246, ¶ 57 (App. 2007) ("Where interpretation of a contract is needed because its terms are reasonably susceptible to different meanings, the matter should be submitted to [a] jury."). Therefore, the superior court did not err by denying the Defendants' demand for a jury trial.

## IV.    Pretrial Disclosures

¶50        The Defendants argue that Wells Fargo failed to comply with its pretrial disclosure obligations. Specifically, the Defendants assert Wells Fargo concealed appraisals of the Pinal and Sunland Gin Properties, as well as other documents, despite repeated requests for production.

¶51        As evidence for their claim, the Defendants note that Wells Fargo did not disclose Nava's appraisals for the Pinal and Sunland Gin Properties until April 8, 2016, more than ten months after the litigation began. Although defense counsel referenced the alleged disclosure violations at both the valuation hearing and trial, the Defendants neither moved to compel disclosure nor asked for a continuance based on an untimely production of documents.

¶52        We review a superior court's rulings on discovery and disclosure issues for an abuse of discretion, *Bowen Prod., Inc. v. French*, 231 Ariz. 424, 427, ¶ 9 (App. 2013), but the Defendants never squarely raised a disclosure issue in the superior court. Regardless, the Defendants acknowledge they received Nava's appraisals in April 2016, a year before

---

[5]        Having found Wells Fargo did not create, mid-litigation, an issue of fact triable to a jury, there was no basis to extend Rule 38's time limits for requesting a jury trial. Therefore, as found by the superior court, the Defendant's demand for a jury trial, more than a year after the original joint report was filed, was untimely.

the fair market valuation hearing. On this record, they have not identified, much less demonstrated, any resulting prejudice from the arguably late disclosure.[6] *See Zimmerman v. Shakman*, 204 Ariz. 231, 235-36, ¶ 14 (App. 2003) (noting the disclosure rules "should be interpreted to maximize . . . a decision on the merits" and explaining that the "relevant question" is whether a late disclosure "is harmful to the opposing party or to the justice system") (internal quotation omitted).

## V.    Final Judgment

**¶53**        The Defendants contend that Wells Fargo failed to prove the amounts due and owing on the TEI and CEI Loans. Without disputing the principal balances remaining, the Defendants contest Wells Fargo's calculation of the total debts, which included interest, fees, and costs. Specifically, they assert: (1) Wells Fargo failed to present admissible evidence to establish the overall debts, and (2) the superior court improperly shifted the burden of production to them.

**¶54**        To prove the total debts on the TEI and CEI Loans, Wells Fargo submitted as exhibits redacted pay histories and spreadsheets, which contained no identifying customer information. Although another Wells Fargo employee compiled the reports, Koster testified that Wells Fargo maintained the TEI and CEI Loan records in the ordinary course of business. She also explained that she was able to identify the redacted pay histories and spreadsheets as reflecting the Defendants' accounts by matching the principal balances owed.[7]

**¶55**        Apart from the principal balances, Koster testified to the variable interest rates on the TEI and CEI Loans, clearly set forth in the loan documents, as well as the imposition of late charges, authorization fees,

---

[6]        To the extent the Defendants likewise challenge other appraisals purportedly not disclosed until after the valuation hearing, they have similarly failed to demonstrate any prejudice.

[7]        Contrary to the Defendants' contentions, Koster testified she was able to identify the payment histories and spreadsheets for the TEI and CEI Loans based on her review of the Defendants' loan files. To the extent the Defendants argue the payment histories and spreadsheets are inaccurate and untrustworthy based on Koster's purported admission that the documents were not "true and accurate," the record reflects only that Koster acknowledged the exhibits redacted the customers' identifying information while the source documents contained no corresponding redactions.

expenses, and costs, also expressly provided for in the loan agreements. Accounting for the principal, late charges, fees, and costs, Koster testified that the combined amount owed on the First and Second TEI Loans on May 20, 2015 was $2,872,700.15 and the remaining balance on the CEI Loan was $573,803.60. Given the superior court's determination that the combined fair market value of the Pinal and Sunland Gin Properties on May 20, 2015 was $2,875,740.16, Koster acknowledged a $3,040.01 surplus on the TEI Loans, as well as the Defendants' $165,000 credit from the settlement agreement. She further testified, however, that the TEI and CEI modification agreements not only required the Defendants to pay all costs associated with the enforcement of the loans, but also all reasonable attorneys' fees, which she stated amounted to $225,852.61.

**¶56**      When Wells Fargo's attorney moved to enter the payment histories and spreadsheets into evidence, defense counsel objected, arguing the exhibits lacked sufficient foundation. While acknowledging Wells Fargo had provided the entire TEI and CEI Loan files to the Defendants for review, defense counsel asserted the underlying source documents were not made reasonably available, given the substantial volume of the loan files, and therefore the payment summaries were inadmissible under Arizona Rule of Evidence ("Evidence Rule") 1006. The superior court overruled the objection, finding Wells Fargo had made the underlying documents reasonably available for examination as required under Evidence Rule 1006 and defense counsel could have timely requested an unredacted copy of the payment histories and spreadsheets, if necessary, rather than waiting until trial to raise an objection.

**¶57**      On cross-examination, Koster admitted that an entry pertaining to an unrelated file of a different customer had mistakenly been logged in one of the reports and a few other charges had been improperly included as well. When the Defendants moved to dismiss the complaint after Wells Fargo rested, Wells Fargo's attorney acknowledged that the exhibits included four improper entries but argued the evidence otherwise substantiated Wells Fargo's claims for reimbursement on the outstanding balances. The superior court denied the motion to dismiss, concluding Wells Fargo had presented sufficient evidence of late fees, interest, and reimbursable costs.

**¶58**      After hearing from both parties and considering the evidence presented, the superior court found, in relevant part: (1) both the TEI and CEI Loan modification agreements included express provisions imposing interest and permitting Wells Fargo to recover all costs, expenses, and fees incurred to enforce the loan obligations; (2) Wells Fargo demonstrated, by

a preponderance of the evidence, the interest, late fees, and costs that accrued on the TEI and CEI Loans; (3) the TEI and CEI Loan documents set forth the applicable interest rates and Wells Fargo presented a credible calculation for the total debts; (4) Wells Fargo withdrew cost claims of $9,625 and the Defendants "persuasively demonstrated" that other charges (totaling $9,397) were not appropriate; (5) deducting those costs, Wells Fargo was entitled to $68,121.20 in costs; (6) Wells Fargo was entitled to an award for reasonable attorneys' fees incurred enforcing the Defendants' obligations under the loan documents, including fees associated with the trustee's sales; (7) the amount owed for the two TEI loans as of the date of the trustee's sales was $2,940,821.35, consisting of First TEI Loan principal in the amount of $1,746,633.02 plus Second TEI Loan principal of $1,126,067.13—together with $68,121.20 in costs and expenses, exclusive of attorneys' fees; (8) the amount owed on the TEI Loans was offset by the fair market valuations of the Pinal and Sunland Gin Properties and the $165,000 settlement agreement; (9) the Defendants owed Wells Fargo $2,940,821.35 on the TEI Loans plus undetermined attorneys' fees, with offsets of $3,040,740.16; (10) Wells Fargo received $99,919 more than it was owed on the TEI Loans, exclusive of attorneys' fees; and (11) both Koster's credible testimony and the exhibits demonstrated that the Defendants owed $573,803.60 on the CEI Loan as of June 28, 2017.

¶59 We review evidentiary rulings for an abuse of discretion and affirm a superior court's admission of evidence absent a clear abuse or legal error and resulting prejudice. *John C. Lincoln Hosp. and Health Corp. v. Maricopa Cty.*, 208 Ariz. 532, 543, ¶ 33 (App. 2004). The admission of summaries is governed by Evidence Rule 1006, which permits a party to "use a summary, chart, or calculation to prove the content of voluminous writings . . . that cannot be conveniently examined in court." Before presenting such a summary at trial, "[t]he proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place." *Id.*

¶60 On appeal, the Defendants contend Wells Fargo failed "to produce [the] actual, real documents that evidenced" the interest, fees, and costs it imposed on the TEI and CEI Loans. When the superior court questioned the Defendants' access to the underlying source documents at trial, however, defense counsel admitted that Wells Fargo had permitted him to review the TEI and CEI Loan files in their entirety, though contending the files were so voluminous that the access was insufficient for purposes of Evidence Rule 1006. This admission was consistent with Koster's testimony that Wells Fargo had made the TEI and CEI Loan files available to the Defendants, and after defense counsel's inspection, no

additional disclosure requests were made. Because reasonable evidence supports the superior court's finding that Wells Fargo provided the Defendants with an opportunity to review unredacted "hard copies" of the underlying documents, we cannot conclude the court abused its discretion by finding Wells Fargo's payment histories and spreadsheets satisfied the foundation requirements.

¶61            Moreover, to the extent the Defendants argue the exhibits "constituted inadmissible hearsay," the uncontroverted record reflects that the payment histories and spreadsheets were compiled and maintained by a Wells Fargo employee familiar with the TEI and CEI Loans during the ordinary course of business. Under the business records exception to the rule against hearsay, a record of a regularly conducted activity is admissible if: (1) made at or near the time by someone with knowledge, (2) kept in the ordinary course of business, (3) made as a regular practice, (4) a qualified witness testifies to these criteria, and (5) the opponent does not show the record lacks indicia of trustworthiness. Ariz. R. Evid. 803(6). To lay adequate foundation under the business records exception, the testifying witness need not have personal knowledge of the creation of the document. *See State v. Parker*, 231 Ariz. 391, 401-02, ¶ 33 (2013) (holding a credit card company's custodian laid sufficient foundation for admitting business records even though the company's merchant—not the company or the custodian—created the records). Here, Koster testified that another Wells Fargo employee created the records in the normal course of business, though identifying customer information was redacted from the records for trial purposes. Accordingly, Koster's testimony provided the court with a reasonable basis to conclude that the exhibits were admissible under the business records exception.

¶62            The Defendants' remaining evidentiary challenges concern a few, specific entries in the exhibits. While the undisputed evidence reflects that some entries were improper, those inaccuracies go to the weight afforded the evidence rather than its admissibility. *See State ex rel. Winkleman v. Ariz. Navigable Stream Adjudication Comm'n*, 224 Ariz. 230, 243, ¶ 31 (App. 2010). Given Koster's unqualified admission that the challenged entries were improper, the superior court deducted those amounts from the overall debt calculations. Therefore, on this record, we cannot say the superior court abused its discretion by admitting the payment history and spreadsheet exhibits.

¶63            Furthermore, although the Defendants contend the superior court improperly shifted the burden of production to them the record reflects only that the court found: (1) Wells Fargo had presented a

reasonable and credible calculation of the total debts owed; and (2) the Defendants, other than challenging a few specific entries, had not presented any conflicting evidence. Rather than shifting the burden of production, the court determined Wells Fargo had proven its damages with reasonable certainty and simply noted that its evidence was largely uncontroverted. *Gilmore v. Cohen*, 95 Ariz. 34, 36 (1963) (stating a plaintiff "should supply some reasonable basis for computing the amount of damage and must do so with such precision as, from the nature of his claim and the available evidence, is possible"). On this record, we cannot conclude the superior court's factual findings concerning the amounts due and owing to Wells Fargo are clearly erroneous. *See Shooter v. Farmer*, 235 Ariz. 199, 200-01, ¶ 4 (2014) (explaining the superior court, as fact-finder, weighs the evidence and resolves any conflicting facts, and the appellate court defers to the superior court's findings of fact unless they are clearly erroneous).

## VI.    Attorneys' Fees Award

**¶64**        The Defendants challenge the superior court's award of attorneys' fees to Wells Fargo. Asserting Wells Fargo failed to prevail on its deficiency claims, the Defendants argue *they* were the successful party entitled to an attorneys' fees award. Alternatively, the Defendants contend that, even if Wells Fargo is the prevailing party, the amount of attorneys' fees awarded was unreasonable and excessive.

**¶65**        After entering its trial findings, the superior court directed the parties to submit applications for attorneys' fees, specifically instructing Wells Fargo to "differentiate between fees, costs and expenses incurred in enforcing the obligations evidenced by" the loan documents, including the events leading to the trustee's sale, "from attorneys' fees, costs and expenses incurred in prosecuting the lawsuit." In its application, Wells Fargo requested: (1) $28,553 for the attorneys' fees it incurred enforcing the Defendants' obligations under the loan documents through the trustee's sales, and (2) $217,165.60 for the attorneys' fees it incurred in prosecuting this case. The Defendants, in turn, requested $80,513 for the attorneys' fees they incurred defending against the lawsuit.

**¶66**        Given the "net judgment in its favor," the superior court determined Wells Fargo was entitled to an award of its reasonable attorneys' fees, and the Defendants were not entitled to any attorneys' fees award. Although Wells Fargo recovered only a fraction of the damages sought in its original complaint, the court concluded it was nonetheless the prevailing party, and therefore entitled to an award of both its prelitigation and litigation-related attorneys' fees under the express terms of the loan

documents. Noting the Defendants failed to raise any specific objections to Wells Fargo's fee entries or challenge the reasonableness of its attorneys' hourly rate, and subtracting the attorneys' fees Wells Fargo incurred pursuing "unsuccessful issues," the court found $15,761.50 for prelitigation attorneys' fees and $170,000 for litigation-related attorneys' fees was "a fair and reasonable award." After subtracting the prelitigation attorneys' fees from the surplus on the TEI Loans ($99,919 - $15,761.50), the court applied the $84,157.50 overage to the outstanding balance on the CEI Loan and entered judgment in Wells Fargo's favor.

**¶67** We review de novo issues of contract interpretation. *Grosvenor Holdings, L.C.*, 222 Ariz. at 593, ¶ 9. We review a superior court's award or denial of attorney's fees, however, for an abuse of discretion. *Democratic Party of Pima Cty. v. Ford*, 228 Ariz. 545, 547, ¶ 6 (App. 2012).

**¶68** In pertinent part, A.R.S. § 12-341.01 provides: "In any contested action arising out of a contract, . . . the court may award the successful party reasonable attorney fees. . . . This section shall not be construed as altering, prohibiting or restricting . . . contracts . . . that . . . provide for attorney fees."

**¶69** As noted by the superior court, the parties do not dispute that their various contracts included express provisions requiring the Defendants to pay Wells Fargo for all legal expenses and attorneys' fees it incurred enforcing the loan obligations. While the Defendants argue Wells Fargo is not entitled to a fee award because it failed to recover the majority of the damages sought, the loan documents do not impose the statutory "successful party" limitation and, by its own terms, A.R.S. § 12-341.01 is inapplicable when it "effectively conflicts with an express contractual provision governing recovery of attorney's fees." *Am. Power Prod., Inc. v. CSK Auto, Inc.*, 242 Ariz. 364, 368, ¶ 14 (2017).

**¶70** The loan documents entitle Wells Fargo to recover only its reasonable attorneys' fees. Although the Defendants argued Wells Fargo was ineligible for an attorneys' fee award on a "deficiency action where no deficiency existed,"[8] they did not challenge the reasonableness of the hours

---

[8] The Defendants maintain there was *no deficiency* on the TEI Loans because the fair market valuations of the Pinal and Sunland Gin Properties exceeded the loan balances (principle, interest, and late charges) by $3,040.01. While there was a small surplus on the TEI Loan balances after subtracting the Properties' fair market values, the Defendants' argument

expended or the rates charged by Wells Fargo's attorneys. Noting the absence of such a challenge, the superior court nonetheless considered the reasonableness of Wells Fargo's fee request and deducted a substantial portion of the requested fees, finding Wells Fargo was not entitled to fees it incurred pursuing "unsuccessful issues."

**¶71**　　　On this record, the superior court did not abuse its discretion by awarding Wells Fargo reduced prelitigation attorneys' fees of $15,761.50 and reduced litigation-related attorneys' fees of $170,000. Nor did the superior court abuse its discretion by finding the Defendants did not prevail, having ordered them to pay Wells Fargo $481,671 for their defaults on the CEI Loan and associated guarantees.

## CONCLUSION

**¶72**　　　For the foregoing reasons, we affirm. Wells Fargo and the Defendants request an award of their attorneys' fees incurred on appeal. The Defendants have not prevailed, and we deny their request. *See* A.R.S. § 12-341.01(A). Under the express terms of the loan documents, we award Wells Fargo its reasonable attorneys' fees and costs incurred on appeal, both conditioned upon compliance with ARCAP 21.



AMY M. WOOD • Clerk of the Court
FILED:　AA

---

fails to account for the $68,121.20 in costs Wells Fargo incurred enforcing the Defendants' TEI Loan obligations.